Hear ye, hear ye. This Honorable Appellate Court for the 2nd Judicial District is now back in session. The Honorable Susan F. Hutchinson presiding. Please be seated. Your Honor, the second case on the docket this morning is 2-22-0327. People of the State of Illinois, Plaintiff Appellee, the Trivia S. Jones Defendant Appellate. Arguing on behalf of the Appellate, Mr. Anthony J. Santella. Arguing on behalf of the Appellee, Ms. Lynn M. Harrington. All right, good morning, counsel. When you are ready, you may proceed, Mr. Santella. Good morning. Good morning, Your Honors, and may it please the Court. My name is Anthony J. Santella, and I represent Trivia Jones in this appeal. As a brief roadmap, I will first address the interview at Ms. Jones' apartment, then the interview at the Illinois Police Department, and I'll conclude with a brief note on the Siebert argument. To start, the interview in Ms. Jones' apartment was a custodial interrogation for which she should have received Miranda warnings. There are three points in particular that this Court should consider when making this determination. First, a heightened concern is required when reviewing the admission of incriminating statements by the intellectually disabled. And as such, in a de novo review, this Court should not only review the audiovisual evidence, but must also look at the evidence of the reports from the Elgin Mental Health Center and other reports in the record. Those reports show that Trivia was re-diagnosed with a moderate intellectual disability, along with autism and panic disorder, and received psychotropic medication. A review of a psychological evaluation from high school showed that her classmates would take advantage of her due to her sweet and gentle nature and intellectual disabilities. If Trivia could not stand up to her high school classmates, she could not stand up to the police. Was she threatened at all by the police? I mean, I've seen the videos. Did Officer Hilga threaten her? Did Officer Hennessy threaten her? Did anybody yell at her? What was the nature of that interview at the house? I think the nature of the – there were, I would say, several natures of the interview at the house. And I think, you know, the appellate court in People v. Jordan has said that Miranda was decided with the recognition that a skilled interrogator would get a person to relinquish his or her Fifth Amendment rights. And so there were times in the interview at the apartment when Detective Hilgoth was using a kind disposition, was using words like honey and sweetheart and being nice to Trivia. And there were times when she did raise her voice, where she did get assertive, where she tried to relate to Trivia from mom to mom. I remember one time when her voice was a little higher than it was during the others. You're saying many times? I'm saying that especially after the point where Trivia said the discrepancy over when MJ stopped breathing, the questioning became more focused and Detective Hilgoth did become more assertive and focused on Trivia as the suspect and as the person who caused the injury. And so I think, you know, we can say that there – certainly there was no denying that Detective Hilgoth was, you know, again, calling Trivia honey, being nice to her. But that's a tool in her toolbox. She can see she doesn't have to be Dirty Harry to get what she wants out of Trivia. And that's a pattern that has existed based on the evidence and how people have interacted with Trivia throughout her life. Well, how – that's the pattern. Whose testimony in particular are you considering when you say that? I'm considering the reports from the Algebra Mental Health Center and the other reports in the record that, you know, the court had read. The court certainly had the high school reports as evidence, which again said her high school classmates would take advantage of her when they wanted to get things. In the discussions Trivia had with Hilgoth, she said the reason she had a baby was that her boyfriend pressured her into having a baby. So there were instances that were seen from the record where Trivia is doing things, you know, to police people. The Elgin reports say that she went out of her way while she was at the mental health center to seek the approval of people in authority. My second point is that as part of – Could I ask? Yes. But for the – if you're talking about the apartment statements at this point, correct? Yes. And so the standard there is the reasonable person modified by an understanding that she was intellectually disabled. It's not subjective, correct? That is correct, Your Honor. And so what – I guess I'd be curious, and I'm sure you're going to address it, but what indicia of not being free to leave are present in the record? Sure. So from the video, I think there is indicia supporting that from the video specifically showing Detective Hennessey standing in the doorway and also showing, you know, the video part of the interview showed that Trivia showed how she took MJ from the room down the hallway, but she's always escorted by the police. And then in the audio interview, which all indication is that only took place in the room, there is clear audio that the detectives block another person from entering the room so they can specifically continue the interrogation. I think that shows they created a barrier between Trivia and the outside of that room and from other people. There's also the fact that we know her mother Patricia was nearby. The testimony was that Patricia was taken in the police car back to the apartment. It's unclear if Patricia was in the apartment. She's certainly not visible in the videos, and she's certainly not part of the video and audio evidence in any way. And I think courts have said it's, you know, a factor way in favor of custody if the family is nearby but not part of the interview. And I think, if I could add, in addition to the review of the circumstances surrounding this interrogation, this court should also consider this interview could have taken place at a different time. And I don't mean to jump around, but I think Justice Kennedy's concurrence in Siebert is helpful because he said there are reasons why a police officer might not give Miranda. They might not be planning on asking the questions. They might be waiting for a more appropriate time. Here, it can't be said the police were waiting for a more appropriate time while they're questioning Trivia while her son is being airlifted to Chicago. And there had already been a hospital interview that established a timeline that established that Trivia was the person who had spent most of the day alone with MJ. And I think that that needs to be taken into consideration when weighing the factors. So, for example, it's not sufficient to say 75 minutes is not atypical of a non-custodial interrogation when that 75 minutes could have occurred the next day. I think that court should also weigh that and determine these factors. Well, if this incident occurred at the home, which we believe it did, wouldn't that make sense for Trivia to be in that comfortable place, her brother's room, where she could watch her favorite television show and be there in the comfort of her own home to talk about what happened? I don't know. The next day, it's not likely she would have been in her own home. But it's that day. Well, the child, I don't know if they offered her the opportunity to go to Lurie or not, but she went back home. Well, I think that the way that the courts have analyzed the location factor for the custodial interrogation is it's not home on the one side, police station on the other. It's that a familiar or neutral location is going to be subject to less compelling pressures than a police-dominated atmosphere. And so what courts have looked at is, is there evidence that police have taken control of the scene? So in cases where the appellate court has found that a custodial interrogation did occur at a home, such as in Fort or Hanna, courts have said, well, there are officers filling the house. The defendants haven't been able to move around without the officers being with them or with the officers' permission. And that's a similar situation we have here in reference back to my answer to Justice Mullen's question. You have the evidence that the officers were blocking other people from accessing this interrogation. You have the fact that we don't know what involvement or where Trivia's mother was. We just know she was nearby. And so it's not simply that it's at the home. It's that police have taken control of the scene. Well, Hilgarth was in street clothes. She was not in a uniform, although she did identify herself to Trivia. Hennessy was in uniform, but she knew Hennessy from a previous, we don't know exactly what, but it sounds like he helped her when she might have been a victim of something. So she knew him. He wasn't formidable like somebody that she would never have known. And she remembered him. There's no question she remembered who he was. I didn't see any other police around there in that house. Well, I think the court also needs to consider that by this point, Trivia had been subject to several exercises of police authority, including questioning by Officers Townsend and by Rapa. From the Exhibit 1 video, which was Townsend's dash cam footage, we see him in a uniform. There's another officer walking by who might be Rapa, but might not be also in a uniform. So Trivia had been seeing other officers in uniform before even talking to Hennessy. And that also includes Hilton for the sit-down at the hospital interview. So I think this court needs to take into consideration what the Apollo Court said in Garza, that there was a growing custodial atmosphere throughout. And that leads to my third point that I wanted to say regarding the custodial determination, and that is that this is not general omniscient questioning. The defense admits that there was general omniscient questioning in this case in the hospital interview. And again, Trivia had had these interviews. Detective Hilton said the hospital interview was for fact-gathering, and was to establish a timeline, and he did so. So the questions that were happening at the apartment interview were not general questions of what happened and did a crime occur. They were specifically trying to see what Trivia's involvement in it was. And that is not the purpose of general omniscient questioning. This would be a very different case, for example, if the responding officer had had body cam footage, and when he responded to the initial 911 call, he talked with Trivia for 10 minutes, and then an incriminating statement was made. But that's not the apartment interview that we have, and this court should accordingly find that that's not general omniscient questioning. As a final note on the custodial interrogation point, the defense admits the entirety of this interview, and the factors support that this was a custodial interrogation. But if this court disagrees with that, it should still find the interview became custodial at minute 38, second 15, as the rough time stamp of the Exhibit 4 interview. And that's when Trivia first made the discrepancy that MJ stopped breathing at 3 and not 4, and that's when Detective Hillgoth repeatedly began to confront her with that discrepancy, blocked people from entering the room, and focused in Trivia as a suspect and asking questions. What made you frustrated enough to do that to your son? These are questions calling for an incriminating statement. They show at this point Detective Hillgoth at least should have stopped the interview and given them a random warning. But she answers she wasn't frustrated. She said that several times during the apartment interview. I wasn't frustrated. Hillgoth came back to it, but Trivia said I wasn't frustrated. Well, I think this court also needs to consider, you know, like the reports are showing and the actual information about Trivia's disability, she's going to do what she can to appease a person in authority. That's something that the Elgin Mental Health Center noted right away, and it's something the Illinois Supreme Court noted in Braggs, which is that a person with an intellectual disability, they might be taking actions or making statements so as to please the person who's questioning them. And so I think that needs to be considered by the court. Again, this is a determination made not from the reasonable person standard, but from the modified reasonable person standard in the position of a person with Trivia's mental capacity. And again, to refer it back to her high school classmates, if she's not going to stand up to them, if she's going to do what they want, she's going to agree with what the police are telling her. Well, you call it a modified standard, but how far do we go? There are other factors that are not modified, so. Well, I think that the Braggs case says, you know, the standard should be modified into the person's mental capacity, and I think that that's what we're asking for here. And that's the mental capacity of a person with, you know, a moderate intellectual disability with this low IQ who is at the 0.1 percentile of intellectual peers. But certainly it is a modified standard, and this court should be reviewing the factors from that perspective. The question is whether she thinks, whether a reasonable person with her condition, her status, believes they are free to leave. Well, I think when you're sitting with the detective and the detective in front of you tells the other officer to block a person from entering the room, that's a pretty clear signal to a person, even with the intellectual disability, that there's now a barrier between the person and the outside of the room. That she's not reasonably, plus considering that there had been, you know, other exercises of police authority, other interviews, and I think this court also needs to consider, again, the timing of this interview, not that it was at 7 or 8 p.m. at that time, but that it was when MJ was still being treated. I know the Fort case said that it was a significant deprivation of a person's freedom not to allow them to attend to their baby. Trivia is, baby MJ was still in care, in critical care, and she was not able to attend to him because she was in this interrogation, and this court does need to take that into consideration as well. Well, did she even know that someone was blocked from coming in the room? We know Hilgoth knew, but we don't have any information, I don't believe, that Trivia knew that her mother or somebody wanted to come in. Well, again, Hilgoth does say that in the middle of her statement to Trivia, so it's not as, and again, it's the audio, so we don't totally know, but from the audio, it's in the middle of a sentence addressed to Trivia. She says that to Detective Hennessey, so she is also addressing Trivia. Trivia would have heard that. She would have heard, you know, give us some time here. She might have. I also think this court needs to consider it's an objective factor. The police are blocking the person from entering the room. Okay. But what about, the door was open, though, at least from what we know. The door, we saw the door was open. Yes, Your Honor. And for part of that, there was, I think for a majority of that, Hennessey was standing in front of that door, so there is also an indication from the officer that other people would not be allowed to enter or exit the room from Trivia's perspective. She had more trouble getting out of the room from the box on one side and the vacuum sweeper on the other side. She had to avoid those things. Then Hennessey wasn't there at all when she went out and showed the CPR that she did just off the dinette or the kitchen area. That's true, Your Honor, and I think it also should be noted that she was always with Hillgoth and escorted by her and that there was other indication that police had taken control of the scene. And how do we know? Again, I don't believe anybody told us that in the trial. How do we know that she wanted to be with her child or that she was prevented from being with her child at the hospital? Well, Your Honor, we know that MJ had been airlifted to Chicago. We know that Trivia had been the one asking for a neighbor to call 911. We know that she had been at the hospital with MJ for that period of time. Detective Hilton testified that he does not recall whether they asked Trivia whether to go back for reenactment, but certainly that's what happened. I think that the evidence shows that Trivia was there for her child and probably would have continued to do so, and I do think that makes a difference. And certainly I think this court, looking at the factors objectively, can say that this interrogation could have continued at a different time. The Logan case, for example, is a good indicator of where they've scheduled that interview for 10 days out in advance. And I think they could have done something similar here where they already had the general information that Trivia had been with MJ for that day alone for most of the time, as well as a timeline of events. Justice Durden, do you have any questions? Well, I appreciate that your time is up, but I'm going to just take a minute or two and tell me your arguments with respect to the Miranda waiver. Yes, thank you, Your Honor. So Trivia could not knowingly and intelligently waive her Miranda rights during the interview with the Arroyo Police Department because she did not minimally understand the very words used in the warning. And how do we know that? We can look at the evaluation by the psychological expert, Dr. Lancaster, which included testing on her word comprehension. Yeah, about those testing, that was not very specific to her. It was sort of generalized percentages of understanding this or percentages of understanding that. Well, I believe Lancaster described the testing in her testimony as saying it really is going through the words and seeing if Trivia knows the definition of them. And there were specific results. We know, like, she couldn't define the word afford. You can also see in the video that she's asking, you know, she needs help reading through the interview. It's consistent with the findings from when she was in school that she's going to replace words that she doesn't know with words she does know. At one point, she says can and keeps reading, and Hildoth has to say, no, it's cannot. So there is indication here that she's, both in the psychological evaluation and the video, that she's not understanding these words. If I can offer an analogy to the court, I think many people have heard the phrase E equals MC squared without being able to actually define what the variables mean. And that's before we factor in the intellectual disability here. You know, you have the evaluation which shows that Trivia does not understand what these words mean, what several of them mean. And there's, no, excuse me. The audio is a bit worse. So your position is she's signing off on each one, putting her initials down, but she has no idea what the words mean? Yes, and I think that there is precedent that shows that that is something that, you know, this court can consider is that a person might sign yes or say yes to these statements without having a full indication of what they're saying. That was what happened in the Daniels case, which is on point to here where the expert said that that defendant had a tendency to just say yes in agreement to whatever was being asked without a full understanding. Here you have multiple experts from, you know, Elgin and Kane County who say that Trivia is exhibiting those same behaviors. We have a twist in this case that wasn't in the Daniels case. This young woman, for better or for worse, her favorite show that is on apparently all the time when she's at home is a show involving law enforcement. She has, for all intents and purposes, memorized most of that Miranda warning because she said to Hennessey several times, yeah, I've got it memorized. But they asked her to read it anyway, and then she signed it. As has been pointed out, on those shows almost everybody confesses, so that's not to be taken into account. But she knew that this was – she appeared to know that this was important to the process. Correct? She expressed excitement at being able to recite this phrase through rote memorization. I think courts in Illinois have repeatedly said that the Miranda warning is not a ritual of words to be recited by rote, and that's what we have here. And given her intellectual disability, without more, it's not sufficient to say that her mere recitation of the words, whether she learned them from Law & Order or some other TV program, shows she actually understood what they mean. And – oh, pardon me, Your Honor. If you could just give me one second. Well, I'm sorry, Your Honor. The point that I was going to make is that when we do have on the video evidence that Hilgoff asks Trivia to explain the rite, the rite remains silent. What Trivia's answer is is, Detective Benson says that on Law & Order, which does not actually define the rite. I'm sorry, what did you say? Detective Benson, Olivia Benson is a character on Law & Order, says that on Law & Order. So that's her response to what does the rite remain silent mean, how you understand it. That's not a definition. And again, to be clear, the defense is not saying that the police need to check with every defendant whether they understand Miranda, but the record makes very clear that not every defendant is Trivia Jones. She has an intellectual disability which precludes her from being able to understand these words and precludes her adaptive functioning from being able to apply them to her situation. The evidence shows that she does not have a minimal understanding of the words used in Miranda, and this Court should find the same. Justice Mullen has a question, I believe. Are there any cases where a reviewing court has affirmed a knowing waiver of Miranda with a comparable, with a defendant with a comparable IQ? Affirmed the knowing waiver. Affirmed a finding of a knowing waiver. Are there any cases where courts have said that someone with a comparable IQ, that yes, a finding that they knowingly waived Miranda was not against the manifest weight of the evidence? I hope I said that right. I believe the, I think so, Your Honor. I think the Brunesco case is exactly that, where you have a defendant who is given IQ tests, showing in a lower range. I don't recall what the IQ would have been in Brunesco off the top of my head, but I believe that, you know, that was a case where the trial judge found that that defendant could not knowingly and intelligently waive Miranda for several reasons, and then the appellate court affirmed that, and then the Supreme Court affirmed that ruling. Well, I think she asked the other question. Are there any cases where the fact that a person has this minimal understanding generally has been confirmed, where the waiver has been held valid? Well, I cannot think of any off the top of my head, Your Honor. Thank you, counsel. You'll have an opportunity to reply if you choose after Ms. Hartigan. Thank you, Your Honor. Ms. Harrington. Good morning, Your Honors. I'm going to have to pull that down just a bit shorter. Thank you. Good morning, Your Honors. Counsel, may it please the Court, my name is Lynn Harrington, and I represent the people of the State of Illinois. Your Honors, I'll first address the initial issue that, here, the trial court properly denied defendants' amended motion to suppress when it found that the defendant absolutely was not in custody during her apartment interview. In fact, our Supreme Court has specifically said, Miranda is not required when police conduct a general investigatory, on-the-scene questioning as to the facts surrounding a crime. That's exactly what happened here, Your Honors. As you can all see from People's Exhibit 3, this was not a custodial interview. I'd like to go through the factors to prove that point. First, the location, not at a police department. The defendant, excuse me, opposing counsel cites to Braggs to support his position. However, in Braggs, the defendant was interviewed six times, and four of those times were at the police department. The facts of this case are completely different. It was in her apartment. The time was 71 minutes. In fact, I believe this court in 2021 held that a two-hour interview was not a custodial interrogation. The number of police, as Justice Hutchinson pointed out, and you look at the video, all you see is Detective Hennessy, shoeless, leaning against a door, and Detective Hillgrove lying on the floor asking the defendant questions. It was very casual. In fact, the defendant was in charge of this environment. The defendant asked the police officers to take off their shoes. If this was a custodial interrogation, they wouldn't have complied. There would have been show of force and other factors that absolutely were not present here. The manner of arrival, and the opposing counsel talks about this, the evidence is there's no evidence that they took the defendant and her mother without the consent back to her house. In fact, Officer Hilton testified that he gave them a ride back, the back doors weren't locked, and they exited the squad car voluntarily when they got to their apartment. With regard to defendant's intelligence and mental makeup, this Court properly noted that that's one of many factors. And, of course, here we look at the reasonable person standard in the defendant's shoes. And even in that case, Your Honors, if you look at all these facts, it's clear that the defendant did not feel that she was in custody, that she could not leave. How do we know how she felt? I mean, I appreciate that, but, you know, that's what we're supposed to do. And you point to these factors, but how does she appreciate the significance of them? I think we have to look at the video, Your Honor, and if you see how relaxed she was, she was very comfortable there. She never asked to see her mother. That's a red herring. We don't know where the mother was. She probably was in the apartment, but she certainly didn't feel like she needed her mother. It was, you know, as Detective Hennessey even says, girl talk. At one point, the defendant asked Detective Hennessey, do you have kids? Oh, yeah, I do, I do. It was a general investigatory conversation. That's it. She was not in custody. How do we know that counsel makes a point that, you know, a parent would want to be with a child while this examination and the treatment's going on? How do we know that she wanted to stay or didn't want to stay? Justice Hutchinson, are you asking about whether she wanted her mother there or whether she wanted to go back to the apartment at that point in time or whether she wanted to stay at the hospital at that point in time, whether she wanted to stay in the chapel because she said she prayed in the chapel. Right. Which, of course, is another – it's designed to be calming, and apparently she found it so because she said she prayed by folding her hands and I think saying, let him be all right or something like that. Right. There's no evidence in the record with regard to that, Your Honor, so that can't be used as evidence that she was forcefully brought. Because, again, the video controls here. All you have to do is watch it and see what went on. They were having a casual conversation, and it was a general investigatory interview. With regard to counsel's comment that they should have waited the next day, simply because in another case they waited ten days, does not mean that the police are – their hands are tied when a baby is fatally wounded, even before they knew that it was fatal, to not get on an investigation, find out what went on. Counsel did raise, I thought, an interesting point, that even assuming this was noncustodial in the beginning, this was a general inquiry, you're the mom, you were here, tell us what happened, tell us what's going on, blah, blah. But at minute 38 on somebody's record, but at some point, the tenor changes, and it goes from general to very focused on what did you do, how frustrated were you, tell us how this happened, tell us how the baby had his head hit. With regard to the – Does that change the status? Okay, no, it does not, Your Honor, because several reasons. First, at minute 38 in People's Exhibit 3, all the defendant said was, oh, it happened, the baby stopped breathing at 3 o'clock when she earlier had said 4 o'clock. Okay, that's a timeline issue, that's not an incriminating statement. I know, but his point is that at that point, now it begins to focus on her, rather than being general investigatory. And that's absolutely fine, Your Honor, there's nothing wrong with that. Then why isn't she – I mean, why isn't it now custodial? Because it's simply they didn't know her motive, first of all, after she admitted that she hit the baby. The state doesn't charge every injury case. It's the police's investigation to determine what went on here. Was this accidental? Was it intentional? What were the facts surrounding the incident? And Detective Hillgroth was entitled to ask, after she said you hit your baby, why did you do that? And then once she said, well, I was frustrated, and the baby would stop crying, okay, then the interview ended within minutes. For those reasons, the interview at the apartment was not custodial, and the trial court properly denied the motion just to suppress on that ground. I'll turn to the second issue, Your Honors. The trial court also properly denied the amended motion to suppress because when it found that the defendant knowingly and intelligently waived her Miranda rights at the O'Rourke Police Department. Our Supreme Court has said in People v. Mahaffey, 1995, you have to look at the totality of the circumstances to determine whether a waiver is knowing, intelligent, and voluntary. And that's exactly what the trial court did here. Mahaffey also says that simply because you have a limited intellectual capacity, that's not controlling. That's one factor among many. You have to look at the characteristics of the defendant and the details of the interrogation without any one factor or circumstance controlling. Also, in Mahaffey, another very important point is that the Supreme Court made clear that the trial court is not bound by the psychologist's findings. It doesn't even have to first find that the psychologist was not credible. It can take that evidence into account, but it also, as a trial fact, has to look at all the evidence. And the key there is Exhibit 5, which is the video at the police station. And it was beyond clear that the defendant knew what she was doing. When she stumbled upon a word, Detective Hillbrock immediately stopped and said no and read it for her. She did have difficulties in reading. But this is not a question of whether she can read. Right. This is a question of whether she understands what is either she is reading or what is being read to her. Exactly, Your Honor, and I was actually just about to say that. The issue is not reading at all. The issue is comprehension. And the trial court made a very good finding when it said, so I find that although the defendant may not read that well or write that well, she seems to appear to have some street smarts. She can communicate with people. Also, in Dr. Lancaster's report, which this is very important, Dr. Lancaster said the defendant was able to recall that she could choose not to speak or answer questions that what she said could be used against her and that she had a right to have an attorney and could speak to an attorney before questioning. Right there. That begs the question. She can repeat it. We know that you can just touch her on the shoulder and she will recite Miranda to you. But does she understand what it means? She does understand, Your Honor. I mean, you have to view that video. Although this issue is with regard to Exhibit 5 in the interview at the Aurora Police Department, I just wanted to get to a really good example of comprehension. Okay. Officer Rapa testified that she told him she conducted CPR on that baby, and he was pretty amazed. He said, well, what did you do? And she came back with, now she might have memorized from Law and Order four compressions and this and that, but to memorize it and to actually effectuate it shows comprehension. So Officer Rapa said she knew what it truly meant. I'm with you if what we had to decide here is whether she understands CPR. But that's not the question. The question is whether she understands a very sophisticated legal standard. Okay. Very good point, Justice Jorgensen. However, the Illinois Supreme Court side in People v. Mahaffey, intelligent knowledge in the context of Miranda need not mean the ability to understand far-reaching and strategic effects of waiving one's rights, or to appreciate how widely or deeply an interrogation may probe, or to withstand the influence of stress or fancy. Here we've got evidence. The evidence of first-order CPR is evidence that she can comprehend. That's the first thing we need to know. Then did she comprehend the Miranda rights? Absolutely. Take a look at the video. It was completely clear here. Detective Hillgroth did a fabulous job of making sure that she understood every single word in those Miranda rights before she signed them. Is it significant that in Mahaffey the defendant had a higher IQ? The opinion says 67. And also had been, let's see, had many prior contacts with the criminal justice system, including six prior convictions. I do not think that is very different, Justice Mullen. First of all, because the court says you not only have to understand the rights, but basically what the rights encompass and minimally what their waiver will entail. Yes, and again, we look at the totality of the circumstances. Not every case is going to have a defendant who's had six priors. But here we had this defendant had an IQ of 51. I'm not in that field, but I would think that the difference between 51 and 67 is pretty minimal. She did have prior police contact with Detective Hennessey because she was a victim, I believe. But she would not have been given Miranda as a victim. No, but she has prior contact with the police. Excuse me, prior contact? You mean the one prior contact that I saw in the record? Yes. It sounds like she was either a complaining witness or a witness. She was a victim. Yes. But again, you have to look at Miranda's not saying, oh, unless you had any contact with the police, you're not going to be able to waive your Miranda rights. Right? That wouldn't make sense. No, but it is a factor to consider when it comes to whether you understand it. Absolutely, Your Honor. And, again, it's the totality of the circumstances that we're looking at. And that's exactly what the trial court did. By the time in reading the Miranda, Hildreth had to tell her if you understand this, you have the right to remain silent, put your initials. She did that. And I think she asked with this pen, there was some reference to the pen. I don't know what else she was going to use. But then by the time she got to at least the third and maybe the fourth one, she didn't even ask, do I have to sign this? She just signed it, which might, I mean, it could be inferred that she understood that she had to sign it and there was some purpose to signing it. Correct? That is correct. But that is not the required standard that the detective has to go through each and every one and say, do you understand? In fact, I think it's the Richardson case that defendant cites to, and apparently in the Richardson case, that's what the prosecutor did. That doesn't mean that in other cases that's required. There's no case law that says you've got to go through every single right and say, okay, do you understand this? Do you understand this? Detective Hildreth set it out in the beginning that you need to understand your rights. She did a very good job at that. And luckily for us, we have video evidence of it. There is some theory that was raised in the briefs that although Hildreth was on vacation and she was called in, before she went to the house to meet her, she stopped at the police station and got information. How is that relevant to this issue? It's absolutely not relevant whatsoever, Your Honor. And opposing counsel also talks about the fact that she got a squad car. It has nothing to do with the legal issues here. Of course she didn't use her car for personal protection. I'm sure a police officer or a defendant, excuse me, detective never would do such a thing. And she obviously had certain equipment maybe in that car that she used for these interviews because she did bring in a doll for her to use. Correct. If the Court has no further questions. Justice. No, I do not. And thank you very much. Thank you. Since I gave counsel extra time, if there's anything you'd like to add as a follow-up, I think that's only fair. Thank you, Your Honor. I did want to say that, you know, and it is in my brief, in the alternative that this Court finds that one of the videos was improperly admitted. This Court has specifically said that the omission of illegally obtained evidence in a trial following the erroneous denial of the motion to suppress is subject to harmless error. Of course, the State strongly disagrees with the fact that there would be any illegally introduced evidence. However, if this Court so finds, you can do a harmless error analysis, and it's clear that even taking out whatever video is in question, there's ample evidence here that the defendant was proven not not guilty of first-degree murder beyond a reasonable doubt. First of all, we have a hospital interview that the opposing counsel never has a problem with, and in the hospital interview, the defendant said that she and the baby, it was only she and the baby that were home all day. Okay, so that helped that we're focusing on investigation. Detective Hillgroth testified to People's Exhibits 10 and 11, the picture of the dresser with damages, and this is very important. Detective Hillgroth testified that she interviewed the defendant's sister, and the sister said there was no damage to the TV stand before everyone left the house on the day in question. So we can make a reasonable inference that damage was caused when MJ's head was smashed into it. Finally, the pathologist testified that the baby's injuries were non-accidental trauma, and he died from cranial cerebral injuries due to child abuse. For all these reasons, Your Honor, the people respectfully request that this Court affirm the judgment of the trial court below.    Thank you very much. Thank you. All right. Justice Malone, did you have any other questions? Nothing further. Okay. Thank you very much. Thank you very much. Thank you very much. Mr. Santella. Thank you, Your Honors. I'd first like to start by responding to the state's argument that the video shows that trivia was relaxed throughout this, these interviews as an indicator against custody. I think it needs to be noted by the court, and again, a de novo review must include review of all the evidence here, including that examining trivia's condition, that it was noted repeatedly by several examiners from different institutions that trivia had an aberration in her ability to understand what was happening to her. She always appeared unconcerned and relaxed when being told about her charges or potential sentences or what happened. And so I don't think that this factor weighs in favor of the state the way the state thinks it does. This is another way that trivia's disability is manifesting, and this court should consider that. But trivia, at least my observation of the actual picture videos, she laughed several times. She initiated the laughing, and then the others laughed with her. I didn't ever see her cry or seem apprehensive. She did at one point appear to be upset with Hildoth because she said, well, I told you I held her nose, or I held his nose. And so that was one area where she seemed to be a little upset, but otherwise she was laughing. She didn't seem to be concerned about her child, in fact, and didn't even ask or find out anything until Hildoth brought it up. Again, Your Honor, the defense admits that that is also part of how her disability is manifesting, and I think as well, you know, if we're looking at factors, we could also talk about the factor of, you know, whether she was tired. There might not be an outward indication of, say, yawning, but the evidence of the report shows, like Dr. Lancaster reported, that as trivia was going on with the interview with Dr. Lancaster, she was answering more questions with, I don't know, was unable to answer more questions. And I think that's an indication of exhaustion, and I think that's similar to what happened in the apartment interview, and could explain exactly what Your Honor is saying. If I can move on to, the state says that at minute 3815, when Hildoth is focusing in more on trivia from the discrepancy, that that doesn't change the status of this interview. Again, the defense admits the whole of the interview was custodial, but it's at this point where Detective Hildoth is specifically focusing on trivia to the exclusion of others. And it should be noted, you know, that the state says, well, there's not a motive here. The whole thing in Miranda applies whether the statement is inculpatory or exculpatory. So here what happens is just that trivia is repeatedly confronted with a discrepancy to the exclusion of other people, and Detective Hildoth should have stopped and given the Miranda rights at least at that point. Well, the biggest discrepancy that I noted during the course of the interview was she, well, it wasn't, she was pretty consistent. He rolled over and hit his head. That's what she kept saying. He rolled over and hit his head. But yet she had him on the floor, and it would be hard to hit his head that way. I mean, she did not change that statement through most of that apartment interview. So she wasn't trying to please anybody. She was maybe trying to cover her tracks. Well, again, pointing to her intellectual disability and how that might manifest, I think it should be noted by the court as well that, again, by the time you're getting to this point in the interview, as I made about there being evidence on the record that she would be tired or exhausted by the end of a lengthy interview, she could be at the point where she's saying what she thinks the detective wants to hear. But at 10 o'clock when she was in the station, it was about 10 o'clock, I think, when she was being interviewed in the station, she wanted water.  Well, they asked her if she wanted water, and she ultimately drank all the water before she went back to her cell. She looked like she was cold because she was in the blanket, but she took the blanket off when she got up to do the what she had said about in the apartment. And she, again, she initiated laughing more than one time during the course of that interview. She did not appear to be exhausted. Well, I would just point out that that is at the Aurora Police Department and not the apartment. If she was exhausted at the apartment, she should have been sleeping by the time 10 o'clock rolled around that night. I'm not saying that, Your Honor. I don't know exactly how the disability is going to manifest in that way. I know that the evidence on the record said that she became more unable to answer questions as lengthier interviews went on and answering more questions like, I don't know. And I think that could explain maybe some of the frustration and some of the ways that she was answering some of those questions and support something that says, you know, she's saying what she thinks Detective Hillegoff wants to hear. When did she see Dr. Lancaster? She saw Dr. Lancaster at least for the Miranda waiver evaluation. But when in terms of the injury? It wasn't that same day, was it? No, it was not that same day. Okay. So if she was saying, I don't know, and you say she might have been exhausted then, we're talking about two different time frames. We're also talking about immutable characteristics, Your Honor. The record showed that these were, this is a disability that first became noticed when trivia was in second grade. And I think it's shown that, again, going back through the records, that she's very consistently tested the same way, had similar observations whenever these evaluations have come up throughout her life. And I think this court can rely on that fact and rely on the consistency of her disability, which cannot be medicated away, cannot just be, you know, does not appear that a psychologist can simply, you know, therapy it away, if you'll excuse the phrase. And I think that this court should rely on that. If this court would allow me to just briefly respond to the State's arguments about Mahaffey, I would just... You can respond to them. Thank you, Your Honor. I would just like to distinguish that by saying that part of the court's finding in Mahaffey is that that defendant had significant criminal contacts, including familiarity with police procedure in Miranda. And not like fantasy TV familiarity, but... It's not fantasy TV. That's what detectives do when they question someone. She knew what a Miranda warning was. She and her detective stayed on the TV program, but not from her prior contacts with the criminal justice system, of which she didn't really have any. And so I just think that would make a distinction. And I think with her disabilities on the spectrum, pinpoint certain things, and that's pretty clear, and she has pinpointed this as something important to her. She doesn't want to miss it. She watches it on every opportunity she gets. And I think she even told them how she was able to watch it all day. So she knows how to get to it, and she knows what it's about. It's special victims unit, I think, is the one she was watching. Well, you know, I think at that point, then, you're treating the Miranda warning as a catchphrase, and it's that memorization. It's like saying, you know, Superman says, up, up, and away, but do you know that means that Superman's going to fly? Yes, I think we do. And I think anybody, including someone with a disability, would know that. Because, first of all, they'd see it on TV, and you'd say, up, up, and away, and then if they heard it on the radio, they would know what it was. I'm talking about the fact that does she have some understanding of, this is police procedure, and they ask it in all important situations. She apparently has focused in on that. The record doesn't support that contention, Your Honor. Yes, it does. She says, I have it memorized. Again, the rote memorization is not the same. I would point out the state says watch the video. Do you have it memorized? No, I'm not going to make you do it, but just a yes or no. And you read it every day. Do you have it memorized? And I'm guessing you probably know the issues, but you don't know how they fall on the piece of paper. I would say that your description is probably accurate for me, but I think the record shows that when you have this disability, and there's a high concern of review, this Court should consider all of that evidence and find that the manifest weight of that evidence shows that she did not minimally understand the words. Yes, I do have a question. Here's the deal. Counsel has, in her final remarks, suggested that even if we were to find errors in the admission of these statements, harmless error should prevail and that there, even without the statements, there is more than enough evidence for us to sustain the ultimate finding of the trial court. Are you asking about if one statement is excluded or if both? They're all out. Counsel indicated that if you look at what would still remain, because it wasn't just the statements that were admitted, her statement at the hospital, she's alone with the baby, the damage to the dresser, the testimony of the sister and the pathologist would be more than enough for a finding of not not guilty in this context. I disagree with that, Your Honor, for several reasons. One is that Detective Hillgoth testified, so not in the video, but her testimony is that similar injuries to children can be slow to develop and might not manifest for as much as 72 hours. So there is evidence here that the police could have been working and were working with a longer timeline than what had just occurred that day. And you're also relying on, pardon me, there was a there was more that Hillgoth said she could have done. She said, oh, I could have talked, you know, I could go and talk to Truby's mother and sister. I could go talk to MJ's dad. I could go establish that timeline. There's not, you know, again, this is a the state brought up evidence of the broken panel. I don't believe that the DNA, the suspected blood was ever tested, whether that was MJ's. I'd note that there was a six-year-old boy who lived in this room. I don't think it's impossible to say that certainly a six-year-old boy could run into a piece of furniture at a certain point. And so I don't think you can say that the harmless error here or that the error is harmless if these statements are excluded. Because, again, there's a longer timeline than just what's occurring during that day. And we're generally saying that Truby was home alone with MJ during the day. Well, that's not entirely true, because obviously Truby is saying that her mother and sister got up and went to work and spent some time there, I believe, until at least 10 o'clock in the morning. And there was evidence that the previous day they had gone over to, I believe, her cousin's house. So there are other things in the record that the officers could have looked at. I note that the Braggs case, the Illinois Supreme Court said that if we're having a criminal justice system functioning just on the admission of these statements, that might be less reliable than when we have extrinsic evidence and there were opportunities for there to be extrinsic evidence. So without Truby's statements, all you really have is that she was alone with MJ for part of the day. And then we have the description and the fact of MJ's injuries, but we don't have that piece to connect them. Okay. I have nothing else. Thank you. All right. Thank you, counsel. Thank you, Your Honor. All right. Thank you both for argument this morning. We will take this matter under advisement and make a decision in due course.